RSH

UNSEALED 4/17/14


FILED
APR 15 2014
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   Plaintiff,<br><br>   v.<br><br>DAN LAYUG,<br><br>   Defendant. | Case No.:<br><br>**COMPLAINT**   14MJ1402<br><br>Title 18, U.S.C., Sec. 371 – Conspiracy to Commit Bribery |

The undersigned complainant being duly sworn states:

Beginning no later than on or about November 25, 2010, and continuing up to September 2013, defendant DAN LAYUG and others did knowingly and unlawfully conspire to commit bribery, in violation of Title 18, United States Code, Section 201(b)(1)(C), with such offense begun or committed outside any particular district; all in violation of Title 18, U.S. Code, Section 371.

The complainant states that this complaint is based on the attached statement of facts, which is incorporated herein by reference.

_____
Shannon L. Rachal, Special Agent, NCIS

SWORN TO BEFORE ME AND SUBSCRIBED IN MY PRESENCE, THIS 15th DAY OF APRIL, 2014

_____
The Honorable Karen Crawford
United States Magistrate Judge

## AFFIDAVIT IN SUPPORT OF
## APPLICATION FOR AN ARREST WARRANT

1.  I, Shannon L. Rachal, being duly sworn, hereby depose and state as follows:

## AFFIANT

2.  I am a Special Agent ("SA") with the United States Naval Criminal Investigative Service ("NCIS") and have been so employed since November 2006. As preparation for my current position, I completed the NCIS Special Agent Basic Training Academy and I have received specialized training regarding the investigation of individuals and entities committing frauds against the U.S. Government. Currently, I am assigned to the NCIS Resident Agency Los Angeles, CA. My duties are to conduct investigations into violations of federal statutes regarding individuals and entities committing frauds against the U.S. Government. In the course of my duties, I investigate, apprehend and prepare for prosecution cases against persons and entities involved in frauds against the U.S. Government. I have participated in numerous and varied criminal and civil investigations of schemes to defraud the U.S. Government. My investigative activities typically include reviewing records, interviewing witnesses, testifying before grand juries, and presenting investigative findings to the United States Attorney's Office. Additionally, during the course of my duties I have assisted in preparing search warrants and have participated in the execution of search warrants.

## INTRODUCTION

3.  In conjunction with the United States Department of Justice ("DOJ"), the Defense Criminal Investigative Service ("DCIS"), the Defense Contract Audit Agency ("DCAA"), and colleagues from NCIS, I have been investigating, among other allegations, fraud and bribery allegations involving LEONARD GLENN FRANCIS ("Francis") and his company Glenn Defense Marine (Asia) ("GDMA"), which acted as a general contractor to the

United States Navy. As part of this investigation, agents are examining whether GDMA and its officers and employees committed fraud in the performance and billing of its contract to perform ship husbanding services to the U.S. Navy; whether things of value were given to various U.S. Navy and other government personnel by GDMA; and whether GDMA, its employees and agents, and U.S. Navy and other government personnel have obstructed justice. Francis has been charged in three cases in the Southern District of California with conspiracy and bribery. *See United States v. Francis*, 3:13-CR-3781-JLS; *United States v. Francis*, 3:13-CR-3782-JLS; and *United States v. Francis*, 3:13-CR-4287-JLS.

4.  Based on the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that Dan LAYUG, an active duty United States Navy Petty Officer First Class, conspired to commit bribery in violation of 18 U.S.C. § 371. Specifically, as set forth below, there is probable cause to believe that LAYUG conspired, confederated and agreed with agents and employees of GDMA and others to corruptly demand, seek, receive, and accept things of value, including money, consumer electronics, and travel expenses, from GDMA in return for being influenced in the performance of his official acts and being induced to do and omit to do acts in violation of his official duties, specifically (1) transmitting classified information, including schedules of U.S. Navy warship port visits, to GDMA personnel not entitled to receive it, and (2) making unauthorized disclosures of proprietary, internal U.S. Navy information to GDMA personnel not entitled to receive it.

5.  As defined by 18 U.S.C. § 3238, this offense was begun and committed on the High Seas or otherwise out of the jurisdiction of any particular District, and thus, venue is proper for this offense in the Southern District of California, as the District in which one or more joint offenders, namely LAYUG, will be arrested in connection with this offense.

6. The facts set forth in this affidavit are based upon my training and experience as well as my and members of the investigations' personal observations; review of documents, government contracting records, and other evidence; interviews of witnesses; and review of physical evidence obtained during the course of this investigation. Because of the limited purpose of this affidavit, it does not set forth all of my knowledge about this matter or all the facts known to the United States.

## FACTS ESTABLISHING PROBABLE CAUSE

7. The U.S. Navy is a branch of the U.S. Department of Defense, whose mission is to maintain, train and equip combat-ready naval forces capable of winning wars, deterring aggression and maintaining freedom of the seas. The U.S. Navy Naval Supply Systems Command ("NAVSUP") is a command within the U.S. Navy, which is responsible for the global supply and delivery of goods and services to U.S. Navy personnel and warfighting assets. The U.S. Navy Fleet Logistics Commands ("FLC") are subordinate commands of NAVSUP located in various domestic and foreign locations and they provide logistics support for all naval installations and vessels operating in each location's area of responsibility. In particular, the NAVSUP FLCs are responsible for soliciting, awarding and overseeing contracts awarded to entities for goods and services, including ship husbanding, required by the U.S. Navy in each specific FLC's area of responsibility. NAVSUP FLC in Yokosuka, Japan ("FLC Yokosuka") supports naval installations and vessels operating in Japan, Hong Kong, South Korea, and Russia. FLC Yokosuka also oversees the operations of a Detachment in Singapore ("FLC Singapore"), which supports naval installations and vessels in Singapore, Indonesia, the Philippines, Thailand, Cambodia, Vietnam, Australia, and elsewhere.

8. GDMA is a multi-national corporation with headquarters in Singapore and operating locations in other countries, including Japan, Singapore, Thailand, Malaysia, Korea, India, Hong Kong, Indonesia, Australia, Philippines, Sri Lanka and the United States. GDMA is owned and controlled by Leonard Glenn Francis, Chief Executive Officer/President, who, with the assistance of NP, Vice President Global Operations; and others, oversees the worldwide daily business and operations of GDMA. GDMA also employs Country Managers for each of its operating locations in foreign countries, including Japan.

9. GDMA is a commercial and government contractor whose main business involves the "husbanding" of marine vessels. "Husbanding" involves the coordinating, scheduling, and direct and indirect procurement of items and services required by ships and submarines in port. Examples of such items and services required by ships and submarines when in port include tugboats, fenders, port authority/custom fees, security, provisions (food), fuel, water, trash removal, collection holding and transfer of liquid waste ("CHT"), transportation, and many others.

10. Many of these items and services are supplied by lower tier subcontractors; however, GDMA does own a vast array of assets, including tug boats; water, trash, and CHT barges; docking equipment; small vessels for patrol (i.e. picket boats); passenger shuttles; security barriers; and other miscellaneous equipment it uses to fulfill husbanding requirements.

11. GDMA has been husbanding vessels for the U.S. Navy for over 25 years. In or about June 2011, NAVSUP awarded GDMA numerous contracts to provide husbanding services to U.S. ships and submarines at ports throughout Southeast Asia (Region 2), Australia and Pacific Isles (Region 3), and East Asia (Region 4).

12. LAYUG is a U.S. Navy Petty Officer First Class, currently assigned to FLC Yokosuka, and has been since 2011. As a U.S. Navy Petty Officer, LAYUG is a public official within the meaning of 18 U.S.C. § 201(a). In this capacity, LAYUG was responsible for screening, processing, coordinating, tracking, and expediting logistics requirements in support of U.S. Navy vessels. Prior to this assignment, LAYUG was assigned to the USS Blue Ridge, the command flagship for the U.S. Navy's 7th Fleet, in several logistics roles including shopkeeper and government purchase card program manager. It was a violation of LAYUG's official and lawful duties: (a) to transmit information that the U.S. Navy had deemed classified to any person not authorized to receive it; and (b) to make disclosure of proprietary, internal U.S. Navy information to any person not authorized to receive it.

13. Francis was the subscriber for the email accounts leonard.glenn.francis@gmail.com and leonard@glennmarinegroup.com. NP subscribed to the email account n[xxx]@glennmarinegroup.com. LAYUG was the subscriber for the email account dlayug2o@gmail.com as well as a government account issued by the U.S. Navy. Email from each of these accounts was reviewed in furtherance this investigation.

## FACTS ESTABLISHING PROBABLE CAUSE

14. According to documents I have reviewed, at least as early as June 2010, LAYUG and NP began developing a relationship in which LAYUG provided classified U.S. Navy ship schedules of future port visits, as well as other internal U.S. Navy information, to NP in return for cash, travel expenses, consumer electronics, and other items of value. In each instance discussed below, neither GDMA nor any of its employees was authorized to receive the classified information and/or documents transmitted by LAYUG.

15. For example, on November 25, 2010, according to emails I have reviewed, NP sent an email to LAYUG's official U.S. Navy email account asking, "[W]hats the sced for next year man!!" Based on my review of the document and the context, I believe a reasonable interpretation of "sced" is that it is a slang term for U.S. Navy ship movement schedules, which are normally classified by the U.S. Navy because advanced unauthorized release of ship movements could present a security risk to U.S. Navy personnel.

16. On February 17, 2011, according to emails I have reviewed, CS, a GDMA employee in Hong Kong, replied to an email from LAYUG's official U.S. Navy email account in which CS introduced himself as the GDMA point of contact for a Hong Kong port visit. That day, LAYUG responded: "Good! Need a hotel man!" Later that day AK, another GDMA employee, forwarded this email chain to NP and others asking, "Did [LAYUG] normally get a 'charity' room for other port visits? Shall we give him one in [Hong Kong]?" A member of GDMA's core management team, AW, responded to AK: "Spoke to boss [Francis] we can arrange a room for him at the Renaissance."

17. In this same email on February 17, NP told AW that LAYUG will be sending to GDMA an "email on the wording for the fuel... He [LAYUG] knows what to say to the [Supply Officer] on the [USS] Higgins in Phuket." According to government records I have reviewed, the USS Higgins visited the port in Phuket, Thailand from February 17-21, 2011.

18. Also regarding fuel, on September 21, 2011, according to emails I have reviewed, NP wrote an email to Francis, copying AW, stating that LAYUG had just called NP about another possible fuel purchase for a U.S. Navy vessel visiting Vladivostok, Russia. Later that day, AW replied to both NP and Francis stating, "That's great if he's monitoring the fuel orders!" Based on my training and experience and according to several documents I have

6

reviewed in this investigation, I know that GDMA benefited greatly from internal U.S. Navy information regarding fuel purchases due to the inflated profit margins GDMA could fraudulently extract from the U.S. Navy when it purchased fuel from GDMA.

19. On February 24, 2012, according to emails I have reviewed, NP sent an email to Francis and AW with three PDF documents attached. In the content of the email, NP wrote that he "received [this] folder from LS2 LAYUG today." The first PDF was a scanned printout of an email sent to LAYUG containing pricing information for a competitor to GDMA. The second PDF was a scanned PowerPoint presentation detailing the logistics of ordering fuel in many ports visited by the U.S. Navy. The third document was a scanned printout of a classified U.S. Navy ship movement schedule marked "confidential."

20. Shortly thereafter, on March 9, 2012, LAYUG sent an email from his official U.S. Navy account to NP in which LAYUG asked, "[w]hat are the chances of getting the new Ipad 3? Please let me know." NP forwarded this email to Francis and asked, "Sir, can I get this for him?" Later that day, Francis responded "Ok."

21. On May 15, 2012, according to emails I have reviewed, NP wrote an email to Francis, AW, and others with a PDF document attached. In the body of the email, NP wrote "received this from our source here in FLC... Guidelines on how [Supply Officers] should order, talk, and handle [Husbanding Service Providers]." The attachment was a scanned official U.S. Navy message addressed to the ships operating in the Pacific region, as well as a printed and scanned email addressed to LAYUG.

22. Based on this evolving relationship with LAYUG, by late May 2012, GDMA agreed to pay LAYUG $1,000 per month. On May 21, 2012, according to emails I have reviewed, NP sent an email to TM, an accountant working for GDMA in Japan, with a copy to

Francis, which said, "please be advised that at the end of each month, we will be providing an allowance to Mr. Dan LAYUG. Total of US $1000. You may pay him the equivalent in Yen. He will come by the office at the end of each month to see you." According to CW-1, a former GDMA Japan employee who was fired from GDMA after, according to CW-1, sustaining an injury on the job, TM and CW-1 delivered some of these payments to LAYUG approximately once per month by handing him envelopes of cash. On many of these occasions CW-1 recounted, LAYUG provided ship schedules to GDMA in the same transaction.

23. Two days after the email describing LAYUG's monthly allowance from GDMA, on May 23, 2012, according to a bank membership application that I have reviewed, LAYUG's wife opened a bank account for their then 9-month-old daughter at Navy Federal Credit Union ("NFCU"). The account was opened at an NFCU branch in or around Yokosuka, Japan, which is where LAYUG was stationed at the time. Thereafter, on May 30, 2012, $400.00 in cash was deposited into LAYUG's daughter's NFCU bank account, and an additional cash deposit of $200.00 was made into this NFCU account on June 5, 2012.

24. The NFCU records for the account of LAYUG's daughter show the following cash deposits between June 15 and August 27, 2012:

| Date | Amount of Cash Deposited |
|---|---|
| 06/15/2012 | $200.00 |
| 07/03/2012 | $300.00 |
| 07/23/2012 | $150.00 |
| 08/02/2012 | $200.00 |
| 08/27/2012 | $550.00 |
| 08/27/2012 (separate transaction) | $3,000.00 |

25. On July 17, 2012, according to emails I have reviewed, LAYUG sent an email to NP asking, "Hey bro, does [GDMA employee RJ] still have that camera? Anyway [sic] you can send it before I go to VA?"

26. On November 1, 2012, LAYUG received an email, on his official U.S. Navy account, from his wife JL that described LAYUG's paycheck for that month, and included information about some expenses, such as paying off credit cards. After this, JL wrote "Then u got $1000 from GDM - $620 to Xevera (western union) which leaves you with 380." According to previous emails and documents from Western Union that I have reviewed, as well as Internet research, Xevera is a housing complex in the Philippines.

27. On January 16, 2013, according to emails I have reviewed, LAYUG sent an email to NP containing six classified U.S. Navy ship movement schedules. NP forwarded these documents to Francis and AW.

28. On two occasions in approximately February and March 2013, according to an interview with GDMA Japan employee CW-1, LAYUG met CW-1 in front of the GDMA-Japan building. CW-1 recalled being instructed by his/her superiors at GDMA to meet LAYUG, and CW-1 remembered LAYUG driving to the GDMA-Japan office and handing him/her a folder of pink paper that contained U.S. Navy ship movement schedules. CW-1 provided to investigators copies of the "pink paper" that he/she received from LAYUG. Pink paper is typically used to print classified information to prevent its unauthorized disclosure. I have reviewed these documents, and believe them to be printouts from a classified U.S. Navy computer system called Web-Enabled Scheduling System ("WebSked"). According to a U.S. Navy publication, WebSked is a web-browser based system for scheduling and planning the movement of major maritime assets, such as ships and ship squadrons. This system is only

accessible via the Secure Internet Protocol Router ("SIPR") Network, the U.S. Government's system for transmitting information that is classified up to and including "Secret."

29. On March 8, 2013, according to emails I have reviewed, JL, LAYUG's wife, sent an email to LAYUG's official U.S. Navy account asking LAYUG if NP had "talked to [LAYUG] yet or brought up anything? It's okay if he says it has to stop but he would have told u right?" Based JL's reference to NP, I believe this to be a reference to the $1,000 monthly allowance LAYUG was receiving from GDMA-Japan.

30. On May 18, 2013, according to emails I have reviewed, LAYUG sent an email to NP with five classified U.S. Navy ship movement schedules. In the body of the email, LAYUG wrote, "[S]orry it's late, here you go bro." NP forwarded the images to Francis with the comment: "I got the schedule from our friend Sir."

31. On May 25, 2013, according to emails I have reviewed, NP sent an email to LAYUG asking LAYUG to "please send me the special arrangements list for the BLR [USS Blue Ridge] in Port Klang, Singapore, and Indonesia." On May 27, 2013, LAYUG responded, specifying "special arrangements" for four other U.S. Navy enlisted personnel. LAYUG also stated that he would "need" a "4 bedroom apartment type villa (Just like what I had before)" set up for the four U.S. Navy personnel when the USS Blue Ridge made its port calls in Port Klang, Malaysia, the "Elizabeth Hotel or whatever you prefer for 4PAX [people]" in Singapore, and a "Hotel room for 4PAX" in Indonesia. LAYUG also asked NP that they be provided with a vehicle "on call." Later on May 27, 2013, LAYUG sent another email to NP stating, "Pare [Buddy], please make sure no names on the vehicle. Lol!" The following day, LAYUG sent another email to NP stating, "Pare, Just want to confirm about the rooms" and

asking how the other U.S. Navy personnel should ensure they received the accommodations. NP replied that they should work with the GDMA-Malaysia Country Manager.

32. Later on May 28, 2013, LAYUG sent an email to NP stating, "Hey bro for the bucket list, if you can hook me up with the below items. Thanks a bunch bro!!

>   Camera
>   Nikon D5200 w/ flip our screen
>   Iphone5 / Samsung S-4 or both hahaha!
>   Ipad Mini"

NP replied to this message stating, "Need latest sced bro. please."

33. On June 1, 2013, according to emails I have reviewed, LAYUG sent an email to NP with four classified U.S. Navy ship schedules attached. LAYUG wrote in the body of the email: "[H]ere you go, let me know if you need anything else." On June 2, 2013, NP forwarded this email to Francis and AW with the following comment: "Update from our pare. Looks like the NIM [USS Nimitz] still on track for Phuket on the way back. This time with 2 ships instead of one as per the previous schedule. Updating the SVS now." I know from reviewing GDMA records that "SVS" is an internal GDMA system used for tracking the movements of the U.S. Navy, as well as GDMA-owned vessels.

34. On July 1, 2013, according to emails I have reviewed, NP sent an email to the GDMA-Malaysia Country Manager inquiring about issues arising after the USS Blue Ridge's visit to Port Klang, Malaysia, as described in Paragraph 32: It "looks like the Ritz Carlton Hotel in KL [Kuala Lumpur] made a mistake with the invoice." NP explained that one of LAYUG's four friends described in Paragraph 32 was billed for the cost of the hotel. NP asked the GDMA-Malaysia Country Manager to have the Ritz Carlton cancel these charges and have GDMA pay for half of the total cost. Later on July 1, 2013, LAYUG wrote to NP saying,

"[S]orry to bother you with this again, but GDMA is taking 50% only? I thought it was [o]n the house bro?" NP responded: "Im trying pare but allot of heat on this right now. Hows the camera bro?" The conversation continued when LAYUG emailed: "[T]he camera is awesome bro! Thanks a lot! Been a while since I had a new gadget!"

35. According to emails I have reviewed, LAYUG and NP continued to email back and forth on July 1, 2013, including a conversation in which NP commented about obtaining some "bags", and LAYUG responded, "You give me so much! Its my turn to treat you!" At the end of the conversation, NP asked LAYUG how the "golfing 'schedule' is coming along?" On July 2, 2013, according to emails I have reviewed, LAYUG sent an email to NP with six classified U.S. Navy ship movement schedules attached. In the body of the email, LAYUG wrote "Pare, Golfing schedule as requested." Based on the content of the attachments, I believe the golfing metaphor to be code for classified ship schedules.

36. According to banking records that I have reviewed, $100.00 in cash was deposited into LAYUG's daughter's NFCU bank account on July 29, 2013.

37. On August 1, 2013, according to emails I have reviewed, NP sent an email to LAYUG asking about updates to the "golf schedule." Later that day, LAYUG responded that he was "still in Guam but will send it to you upon my return… Sorry for the delay."

38. On August 19, 2013, according to emails I have reviewed, LAYUG sent an email to NP asking, "Can we hook my VIP's up for next week in Busan [Korea]? 2 Suites in Huendai Beach and some free [transportation] would be really nice! Let me know what you need pare!" On August 21, 2013, according to emails I have reviewed, LAYUG received an email from SK, GDMA Country Manager for Korea, stating "Dan, two rooms hooked up at

Novotel from Fri to Sunday" and continued that he (SK) would arrange transportation for LAYUG's "VIP's." LAYUG responded, "Thanks brother! Your [sic] Awesome!"

39.     On August 27, 2013, NP responded, "Any update on the Golf Schedule for the officers? I need to make the arrangements." LAYUG responded later that day saying, "Hi Neil, I will have it ready for you tomorrow."

40.     Based on the foregoing, I respectfully submit that there is probable cause to believe that Dan LAYUG, a U.S. Navy Petty Officer First Class has knowingly and unlawfully conspired with others to commit bribery in violation 18 U.S.C. § 371, and therefore, I respectfully request an arrest warrant issue for Dan LAYUG.

//
//
//
//
//
//
//
//
//
//
//
//
//

## REQUEST FOR SEALING

41. I further respectfully request that the Court order that all papers in support of this application, including the affidavit and arrest warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. In particular, LAYUG has strong ties to the Philippines, is now stationed in Japan, and does not know that his arrest is contemplated. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Shannon L. Rachal
Special Agent
Naval Criminal Investigative Service

Subscribed and sworn to before me on _____April 15_____, 2014.

THE HONORABLE KAREN S. CRAWFORD
UNITED STATES MAGISTRATE JUDGE